Appearing for Appellant is Attorney Howard Feltman and for Appellee is Attorney Peggy Ryan. Good afternoon. Mr. Feltman, are you ready to proceed? May it please the court, counsel, my name is Howard Feltman. I represent Appellant Respondent Jeffrey. This case is discreet in my view in the sense that there are two issues and I know I'm not going to belabor the issue. This case arises from a dissolution that occurred in 2010 where a judgment of dissolution of marriage was entered and there are two issues that arise from that judgment. They arise as a result of a modification proceeding commenced in October of 2015. The judgment in 2010 had a provision in it that provided that the marital residence was awarded to the petitioner, which has been quitclaimed to her, but the mortgage was assigned to Mr. Agrall. And he was to either satisfy it, and the language is satisfy the mortgage or continue to pay the mortgage until satisfied. That is what the judgment stated. Mr. Agrall chose to make the monthly mortgage payments and has continued to make the monthly mortgage payments. This court, I am sure, is aware that this is a second appeal. There was an appeal from the original judgment of dissolution of marriage filed by Mr. Agrall. There was no cross appeal. It is our position that the determination as to this language and Mr. Agrall's right to be able to pay the mortgage on a monthly basis rather than a lump sum is part of the property provisions contained in the judgment and not subject to modification by a subsequent proceeding pursuant to 510A. To set aside or to change a property division, you need to bring a motion effectively under 214.01 claiming that somehow the judgment is procured by some improper way. The trial court in this case, and I would like to tell you that I remember the exact date, but when the modification was entered in 2016, indicated that it felt that it could effectively advance the note, make Mr. Agrall pay the mortgage, and that it is a mere enforcement of the judgment. The language contained in the judgment to me is not ambiguous. It is not subject to trying to figure out what it is. It is either to satisfy the mortgage or to pay the mortgage until satisfied. If he's paying the mortgage until satisfied, if he's making those monthly payments and he's current, there is nothing to enforce. He is meeting his obligations as created by the judgment that's there. So this really comes down to a basic determination by this court. Did the trial court have jurisdiction? Counsel, of course the trial court had jurisdiction. It may have been erroneous, but the idea that it has no jurisdiction over the parties is just a misnomer. I will concede that the court had jurisdiction of the parties not to make the change that was there, is what we've been trying to say. Notice you cited a 1929 decision, rather predating our 1970 Constitution, which makes clear that the jurisdictional issue is no longer a proper argument. Okay, go ahead. So, with respect to that argument versus, and there was no appeal. And by saying no cross appeal, saying this doesn't make sense, no motion to reconsider, nothing that really attacked this provision. And Mr. Eggroll, for whatever his reasons are, and they're his reasons, relied upon that, has met his obligations, and continues to meet his obligations. I don't know what's being asked to be enforced, unless they're trying to just enforce half of that provision and not the other half. The more difficult, in my view, being candid with the court, relates to the modification of the maintenance provision that was a rehabilitative maintenance petition for five years. Prior to the parties' dissolution, Mr. Eggroll was a farmer. Modest income, and I believe from a statement of facts and from a police brief, Mr. Eggroll's income was approximately $50,000 from farming at the time that the parties' marriage was dissolved. Ms. Eggroll had been a stay-at-home mother for a number of years, had done some, I think, preschool teaching, and really had been out of the workforce. And at the time of the dissolution, was working, or started to work shortly thereafter, with the Sagamon County State's Attorney's Office, earning in the mid-20s. Also did a second job with Hobby Lobby that supplemented her income. Over the period of the next four to five years, until the time of the judgment, she stayed in that position. She is college educated, and her income increased to approximately $37,000 at the Sagamon County State's Attorney from where it was to 2010. In addition, her Hobby Lobby income also continued, and her total income was in the mid-40s, maybe a little lower than that. Mr. Eggroll was fortunate post-judgment. I'm not going to belabor that, but that's what drives this case, to be honest with you, is the post-judgment income of Mr. Eggroll. Mr. Eggroll had received, as part of the award, non-marital farm land in Sagamon County. I think it's Sagamon, it could be Logan, near where the Torres Coal Mine is. There hadn't been a severance of coal interests, and he started to receive coal royalties. That combined with some increased commodity prices, substantial increases in commodity prices, his income skyrocketed. Now, I would suggest, just so that it's clear, the coal is a sale of property that's part of the real estate that was there. He sold it, and his income at times was in excess of $200,000. He was fortunate. Now, he's paying his maintenance. He had 60 months. It was known by everybody, including Ms. Eggroll, that this was rehabilitative maintenance. She had never sought additional employment from the Sagamon County State's Attorney's Office. Let me be clear about that. There is nothing wrong with serving as a secretary in a public body of the Sagamon County State's Attorney's Office. When you make certain economic decisions about employment, those are knowing decisions that you make. You recognize the consequences of your action. If I decide to practice law in Springfield, Illinois, and not practice law in a big firm in Chicago, my income is going to be different. Whether I can get into the big firm in Chicago is a separate issue. I make a separate and distinct economic decision that, for whatever reason, I like to commute. It's better than commuting downtown Chicago. I like the benefits. One of the things the testimony was, she liked the fact that she had invested the fine benefit plan. If you get invested, you trade off maybe some current income to do that. The bottom line, when you look at her overall expenses, this goes to the ultimate issue before the court. What constitutes a substantial change in circumstances to modify a judgment? Is it a substantial change to Mr. Eggroll's income post-judgment? Or is it a substantial change in something that happened between Ms. Eggroll during that five-year period that would cause her to need to maintain maintenance? I would suggest that if the court considers the six items contained in the brief of FLE, it will note that five of the items relate to Mr. Eggroll. Ms. Eggroll made a choice. She didn't seek other employment. What's the standard of review? Abuse of discretion. I'm not going to... We'd have to conclude that no person like Judge Davis, no reasonable person, could possibly conclude that changing this maintenance was appropriate? I believe that's correct, Your Honor. And I recognize it. I'm not... I believe... But within that confines of looking at that abuse of discretion, you have to look at how the court analyzed the fact. If the court totally looked at just Mr. Eggroll's income and applied a wrong analysis rather than looking at Ms. Eggroll, then maybe the court remands the case for the court to consider it based upon the standard. The court has previously... Not the remandment. The court has previously stated in Ray, the marriage of Raynard, that you really don't look at the post-judgment income of the individual. Were we right to so hold? I believe you were right, because quite honestly... And this is a long-term marriage. I'm not going to say that it's a short-term marriage, Justice Steinman. But if you have a 20-year marriage and somebody post-judgment decides, gee, I'm going to change my lifestyle and I'm going to become a surgeon, it makes a lot more money, goes to the education, does it? That prior spouse shouldn't be entitled to that amount of money. Just the same that a spouse paying maintenance on a permanent basis, if it walked into court and said, you know, I've been making $200,000 as a physician. I really want to be a missionary, so I'm going to voluntarily give up the missionary job post-judgment. Everybody's going to say, no. And I've used extremes to try to raise that point. The real question is, post-judgment, people get on with their lives. Mr. Eggroll was fortunate. I'm not suggesting that. And her lifestyle... This isn't a case where somebody has totally changed her lifestyle. When you look at the expenses, the big expense that has changed is health insurance. Suggested changes for all of us in five years. But the bigger question is, to me, her income went up in excess of 30%. It went from $27,000, $30,000 to $46,000. And that's without seeking another employment with the state of Illinois. Separate set of issues. But are there any other comparable kinds of jobs? When Mr. Eggroll received his judgment, came to this court, that judgment was affirmed. His expectation was that he had a maintenance obligation for 60 months. Ms. Eggroll wasn't sick. She didn't lose her position. She didn't have some impediment to keep her from being able to move forward. She liked what she was doing and the benefits she was receiving from it. That's a voluntary choice. Your Honor, I believe that the judge looked at this and made the determination, based not upon the substantial change in circumstances of Ms. Eggroll, but made the decision based upon the fortunate economic circumstances of Mr. Eggroll. Thank you very much. Thank you, Mr. Feldman. Ms. Ryan. Good afternoon. May it please the Court, Counsel, Mr. and Mrs. Eggroll. My name is Peggy Ryan, and I represent the petitioner, Applelee Annette Eggroll. With respect to the mortgage issue, the trial court said in 2010 that Jeff is directed to satisfy the mortgage on the property in a lump sum or continue paying the mortgage until satisfied. The court said nothing about at Jeff's option or Jeff's choice. Rather, it said he's directed to satisfy the mortgage on the property in a lump sum or continue paying the mortgage until satisfied. In fact, Mr. Eggroll, for more than six years now, has made the minimum monthly mortgage payment on this mortgage. The court back six years ago, I don't believe, could have foreseen that. I believe what the court was doing back six years ago was recognizing the fact that there had been a $65,000 payment that Mr. Eggroll had been ordered to pay Mrs. Eggroll and was giving the payment of monthly amounts of the mortgage for a period of time, recognizing that she could come back and ask for a payoff of that. $44,000 was the amount that was owed on that mortgage when we were in court, which would be, if we disregard interest on that completely, another 11 years that Mrs. Eggroll would have to wait to receive her house that was awarded her. Effectively, what Mr. Feldman's interpretation would do is basically chain her to this house because should she sell this house, there would be a mortgage. But in order to close the sale, the house would have to be paid. Isn't this a good argument for why this agreement shouldn't have been made in the first place? Why the what shouldn't have been made? The agreement shouldn't have been made in the first place, giving him that option. There was no agreement. This was a court order. There was no agreement. This is Judge Childress ordering this. It was not a settlement agreement. I would agree with you that had there been a settlement agreement, I would have written it a lot differently depending on how it was. So if the court had just said he can continue to make monthly payments on this until it was paid in full, I believe this would be a different situation because, in fact, we would be asking for a modification. But the fact that the court threw both languages out there, both parts of that out there, and then basically chose the mechanism the court on our motion to enforce, chose the mechanism by which it would occur. It said, I'm going to order the lump sum payoff of this. That's an enforcement. There's two options there available, and the court then chose what option that would be for the payoff of the mortgage. And courts, you know, oftentimes are called on for a variety of reasons to figure out an ambiguity, to make a determination based on what the property award was. It's not the ideal situation. It's not perfect. But often courts are called on to do that. You see that sometimes in pensions. You see it with military retirement. You see it for a variety of different reasons. But that's exactly what this court did. And it specifically said, you know, the determination, the way Mr. Agro wanted it to be, would be basically saying you're waiting 20 years for someone to get the piece of property that was awarded to them. And that makes very, very little sense. You know, did the court consider, I am sure, after it determined that it had an option of going one way or the other way, did the court at that point look and recognize that his economic situation had changed in terms of his ability to pay off a mortgage? He no longer owed $64,000 and rather had had, as Mr. Feldman called it, some great fortune in terms of the assets that had come his way from property, and assets that were unknown, monies that were unknown at the time of the judgment of dissolution of marriage. I believe that on a situation like this where it's an enforcement and not a modification, that it's an abuse of discretion standard. I believe that the court was well within its authority to issue this order and that it really, to argue that no reasonable person would do what Judge Davis did, I don't believe is a valid argument. Ms. Ryan, I understand your point about does this judgment tie her to the home if Mr. Adger opts to continue paying the mortgage until it's satisfied. But wouldn't that have been an issue to address via cross-appeal? I don't think so. In terms of, I believe that we always had that right, that the way that it was written was such that she always had the right to go to the trial court and say, hey, there's two options here. There's two ways of doing this. You choose option two now. You have both of these that are alive. You choose the second one, rather than to go through the expensive process of an appeal. I don't believe that she had the obligation to do that. I believe she waived nothing because the trial court continued to have the right to say what direction we're going on the payoff of this mortgage. Had the trial court said, Mr. Adger can make monthly payments on this mortgage for the remainder of the mortgage term, I believe she would have had to have appealed that then because that was the only, that was the absolute way that it was supposed to happen. But when there is language in there saying it's one or it's the other, and she had the right to go forward at a later date and say, hey, I want that lump sum payoff. I'm asking the court to enter that. Then the trial court still had the option of doing that. With respect to, and we did cite law, in terms of the Marriage of Davis case, which set forth the test, which is does the petitioner seek to engraft new obligations? And we did not ask for new obligations. We asked simply for the payment of the mortgage under a term that had always been there in the divorce decree. So I believe under that Marriage of Davis standard, this is not a modification either, but rather an enforcement. With respect to maintenance, this is a case where the court did not increase maintenance. The court maintained the exact amount of maintenance. We asked for an increase of maintenance based on a variety of different circumstances, but it maintained the same amount. What it did is it said it changed it from rehabilitative maintenance to permanent maintenance, which the court has the right to do. And there's certainly case law where rehabilitative maintenance has been preferred. It's denial of an increase in maintenance is not before us, is it? It's not. And I laid that out in arguments as well. They did not appeal the amount. They're appealing the making of it. The name is you, though. I'm sorry? I'm not sure I understand. You didn't appeal that. We did not appeal that. Okay. No, we did not do that. Okay. And that's a tough issue of whether you appeal things like that when you have a person who's a very moderate income person of how much appealing you do of those things. But the reality is that that's not an appeal. And so what they're asking for is that either be rehabilitative again or that it be terminated altogether. And I believe that the evidence in this case showed that this is a case where the court properly made this permanent maintenance, and for a variety of reasons. I mean, there's a discussion about her income increasing, and it has increased a bit. It's increased kind of like county employees' income does, very, very moderately. She worked a second job at Hobby Lobby. There was a petition filed for fees where we laid out in verified fashion and form that she no longer worked there because of an injury she sustained. And that's part of the record in this case. But with respect to her income, very moderate. With respect to his income, with respect to Mr. Aggrel's income, and we're not, I'm talking just the farm income. And the capital gain income associated with these coal rights that he received and so forth, those really were fairly modest, the actual capital gain income. The amounts he received were much larger than any kind of reported income. So basically what he had at the time of the trial was income of about $50,000. I think there was one year that was $52,000. His income in 2012 was $225,000. This is taxable income, not gross farm income. This is taxable income. Then in 2013, it was $108,000. Then it went up to $133,000. Compare that to what her income situation has been. And this is based on working off the same farmland, being the same kind of farmer he's always been. It's not that, you know, he went out and got another job. It's he's doing what he always did. And that's straight farm income and not the coal right? This is a bit of capital gain in there, too, I believe. And I'm not sure how they ascertain the basis for those mineral rights and so forth and how they came up with the capital gain income. But the amounts that he received from the mineral rights, much, much, much higher than what was reported as income. The point is at some point the coal income is going to disappear. Right. Right. And with respect to what's included in those figures, that $225,000, $108,000, and $133,000, the amount of income from capital gains is very, very small that are included in those figures. The mineral things mostly were not reported as income. And I'm not sure how that all worked, but that's in addition to this increased income that he received. Gross farming income went up very, very substantially. Went up in 2008 from $241,000 to 2012 was $455,000, then 2013 $355,000, then up to $390,000 in 2014. With respect to the coal royalties, the testimony was he didn't know how much he'd received in 2015. He didn't know. The court said he wasn't quite sure. The court didn't quite find that necessarily part of that believable, but that was his testimony. So his income situation and then her, you know, her insurance rate, her insurance has had about tripled. She had her expenses over the time of the divorce had increased very substantially. I think over $1,000 a month in terms of what her expenses are. This was a 26-year marriage. I did for the court maintenance under the new guidelines, and I took the 2014 figures that he made and her 2014 figures and just did the analysis for the court. His statutory, if you do guideline maintenance calculation, would be $2,500 a month, and it would be permanent because it was a 26-year marriage. I believe that in the court, and it went through 504 factors, it went through 510 factors, and it analyzed all the factors in its decision. And I believe it balanced all of those factors and was well within its authority to make this maintenance permanent. And it cited, I think it took pains to cite Illinois law supporting making maintenance permanent in this kind of a case. I am more than happy to answer any questions that you might have with respect to this. Thank you very much. All right. Thank you, Ms. Ryan. Mr. Feldman. The specific language from the judgment, Your Honor, is Jeffrey is directed to satisfy the mortgage on the property in a lump sum, and then I underline this word or. Not and, not potential, or continue paying the mortgage until satisfied. You don't have to say until done. Until satisfied means until done. There's no room for, there's nothing there to modify. It is just merely to, if you're enforcing it and he's making every payment, I guess the best way I would put it, if somebody came in for a rule to show costs and says you haven't paid it off, and he comes in and says I've made every payment on the mortgage since the judgment was entered, I believe the court would say you're following the court order. In effect, that's what you're allowed to do. Whether this was a good order or not a good order can be debated. How many years are remaining? I don't know. There's a number of years, and possibly if she came in and said she has no interest, I asked if the house had been listed, if there was any reason to do it, you could even subordinate the loan if she needed to do a home equity. That's not before the court. So he's not paying it off as a matter of he's in a SNIT? He's not paying it off because he thinks it's in his best interest to continue to do it. He's in a SNIT? That is the court. I would not suggest that. Okay. What do you suggest? I suggest he believes it's to his benefit to make monthly payments that he can deduct on partly the interest that's doing it. He's allowed to do that. He didn't write this, Your Honor. Who wrote it? Judge Childress wrote it. Why did he do that? I can't tell you. I was not the trial counsel at that time. And nobody has suggested that he did. I'm not, as Ms. Ryan said, she wouldn't have agreed to such language if she put it in. But nobody objected to the language for five years. We went to five years until anybody even raises the issue and it's tied together with maintenance. Now, with respect to the maintenance, the court's just listened to Ms. Ryan. The payment, it's all relating to the post-judgment income of Mr. Eggroll. This is a retrial of what occurred in 2010. There wasn't permanent maintenance, so now I want to get permanent maintenance. She's college educated. She's voluntarily paid. It's not that she's not working. It's not that she can't find a job. She found a job she likes. And she wants Mr. Eggroll to supplement it because it doesn't pay enough. And I would suggest the increases in income over the five years, although modest, compared to many government jobs in this area, that is more than modest because there haven't been any increases for a lot of employees over a number of years. And what was said was that Mr. Eggroll's standard of living during the marriage, not standard of living after the marriage. And what was said was that the family lived on $50,000 a year. Now Ms. Eggroll, in the record, has $46,000 from her two jobs. So there's $4,000 difference for her to live on her own. Thank you, Your Honor. I don't have anything further. All right. Thank you. Thank you both. The case will be taken under advisement and a written decision shall issue.